Hillsborough County Probate Court
No. 2000-263

## IN RE GUARDIANSHIP OF SHIRLEY LANOUE

Argued: March 7, 2002
Opinion Issued: June 7, 2002

*Mark H. Campbell,* of Manchester, on the brief and orally, and *Thomas, Utell, Van De Water & Raiche, P.A.,* of Manchester (*Mitchell P. Utell* on the brief), for the appellant.

*John D. MacIntosh, P.C.,* of Concord (*John D. MacIntosh* on the brief and orally), for the Office of Public Guardian.

DUGGAN, J. The appellant, David Lanoue, Sr., appeals a Hillsborough County Probate Court (*Cloutier*, J.) order granting the respondent, Office of Public Guardian (OPG), the authority to permanently place his wife, Shirley Lanoue, in a residential facility near their Seabrook home. On appeal, he argues that the probate court's exercise of discretion is unsustainable because it authorized the guardian to remove his wife from their marital residence absent specific findings justifying the deprivation of her right to reside with him. We affirm.

In 1987, Shirley Lanoue suffered a stroke and cardiac arrest which caused serious brain injury. She became incapacitated and required twenty-four-hour care. The probate court appointed the appellant as her guardian. In September 1997, however, the probate court removed him as her guardian and appointed OPG as successor guardian.

After appointing OPG, the probate court approved its plan for Lanoue's care and treatment. The plan permitted OPG to arrange for Crotched Mountain Community-Based Services (Crotched Mountain) to provide daily support and rehabilitation services to Lanoue in her marital residence in Seabrook. In May 1999, OPG filed a motion in the probate court requesting, among other things, the authority to permanently remove Lanoue from her home and either to place her in the Exeter Healthcare facility or to locate a personal residence for her (outside of her marital home) that would be supported by staff on a twenty-four-hour basis. In support of its motion, OPG explained that "Mr. Lanoue has repeatedly interfered in OPG's and Crotched Mountain's efforts to provide continuing support and care to Mrs. Lanoue. For example, there have been numerous confrontations between Mr. Lanoue and staff hired and/or supported by Crotched Mountain which have resulted in resignations of staff." OPG further explained that "[t]he conflict between OPG, Crotched Mountain and Mr. Lanoue came to a head on May 3, 1999 when, because of fears that Mr. Lanoue would not return to the Seabrook residence that evening, Shirley was placed at the Exeter Health Care Facility on a respite basis." At the time OPG filed this petition, Crotched Mountain had withdrawn from their contract to provide services to Lanoue on the basis that it had reached an impasse with the appellant.

The appellant objected to OPG's request to permanently change Lanoue's residence and further disputed the specific allegations supporting its request. He asked the court to immediately return his wife to their marital residence and to reinstate him as her guardian.

After a hearing, the probate court denied the appellant's request to reinstate him as guardian, and authorized OPG to continue Lanoue's placement at the Exeter Healthcare facility. In support of its decision, the probate court explained that although the appellant has been a zealous

advocate for his wife, he "is misguided in providing . . . care . . . for his wife Shirley." The court further questioned "whether or not he is able to provide adequate conventional medical care for his wife because of his disregard for other people's point of view including licensed medical practitioners." The appellant moved for reconsideration, which the probate court denied. This appeal followed.

On appeal, the appellant does not dispute the probate court's refusal to reinstate him as his wife's guardian. Rather, he disputes the decision authorizing OPG's removal of his wife from their marital residence absent specific findings of harm. He also argues that the probate court could only authorize the guardian's actions upon a showing of proof beyond a reasonable doubt or by clear and convincing evidence that such actions were necessary to the ward's well-being.

■ We first address whether the probate court was required to make specific findings of harm before authorizing Lanoue's removal from her marital home. We find nothing in RSA chapter 464-A (1992 & Supp. 2001), the chapter pertaining to guardianships, that requires the probate court to make specific findings of harm in determining that a ward may be removed from her marital home. Although the probate court is required to find beyond a reasonable doubt that the ward's placement into a *state institution* is in the ward's best interest and is the least restrictive placement available, *see* RSA 464-A:25, I(a)(1) (Supp. 2001), no similar provision exists regarding the admission of a ward into a private institution. In fact, the statute provides that except as modified by court order, "the guardian shall be entitled to custody of the ward and may establish the ward's place of abode within or without this state." RSA 464-A:25, I(a). Thus, so long as the guardian acts "with respect to the ward in a manner which safeguards to the greatest extent possible the civil rights of the ward, and [restricts] the personal freedom of the ward only to the extent necessary," the probate court may uphold the guardian's decision to admit a ward into a private institution. RSA 464-A:25, I(g) (Supp. 2001). Of course, the probate court has the authority to limit the above powers of the guardian or may impose additional duties on the guardian if it deems such action desirable for the best interests of the ward. *See* RSA 464-A:25, II (Supp. 2001).

Because this case involves not only the admission of a ward into a private institution but also the removal of a ward from her marital residence, the appellant contends that the probate court was required to make specific findings of harm. We disagree. As previously noted, the statute does not require specific findings of harm, but only requires that the guardian act "with respect to the ward in a manner which safeguards

to the greatest extent possible the civil rights of the ward, and shall restrict the personal freedom of the ward only to the extent necessary." RSA 464-A:25, I(g). Here, there was substantial testimony that OPG tried to provide care to Lanoue within her marital residence, but was ultimately required to remove her because of the exceptional difficulties both it and Crotched Mountain experienced working with the appellant. *Cf. Ex Parte Chace*, 58 A. 978, 982 (R.I. 1904) (explaining that in the absence of exceptional circumstances, a ward is entitled to reside with his or her spouse).

■ In authorizing the removal of Lanoue from her marital home, the probate court discussed several factors, including the appellant's criticism of the caretakers, his insistence on providing various treatments to Lanoue despite their questionable effects on her, his refusal to abide by an agreed upon code of conduct and his uncooperativeness in helping find a more suitable apartment for his wife despite his knowledge that he needed to obtain a new residence in order for Crotched Mountain to continue providing services to her. Eventually, Crotched Mountain informed OPG that it was terminating its contract to provide services because of the appellant's unwillingness to cooperate, its dissatisfaction with the care provided by the appellant, its inability to provide the quality of care to which it believed Lanoue was entitled, and its staff's refusal to work at the Lanoue residence. There was also testimony that the appellant had had similar problems with other agencies that provided services to Lanoue within her home. In an attempt to keep Crotched Mountain as a service provider, OPG requested the appellant to sign a contract promising to stay in his office during the day and not interfere with the caretakers while they provided care for his wife in their home. The appellant, however, refused to sign such a contract. We conclude that there is sufficient evidence to support the probate court's findings and to support its decision to remove Lanoue from the marital home.

Next, we consider the appropriate evidentiary standard to be applied by the probate court in allowing a guardian to move a ward from her marital residence to a private residential health care facility. The appellant asserts that because Lanoue's right to remain in her marital residence is at issue, the probate court could authorize the guardian's actions only upon a showing of proof beyond a reasonable doubt or by clear and convincing evidence that such actions were necessary to the ward's well-being.

The appellant, however, never argued below that the probate court was required to make specific findings supporting OPG's authority to remove Lanoue from her marital home either by proof beyond a reasonable doubt or by clear and convincing evidence. Moreover, during oral argument,

counsel for the appellant conceded that he did not raise this issue either during trial or in his motion for reconsideration. When "a statutory claim is not properly raised below so as to put the tribunal on notice that it should address the factual as well as legal issues peculiar to such a claim, we will not review the claim on appeal." *Raudonis v. Ins. Co. of North America*, 137 N.H. 57, 60 (1993) (quotations and ellipses omitted).

■ Finally, the appellant argues that his wife's removal from the marital home created a *de facto* legal separation and that this intrusion upon the marital relationship is beyond the scope of the probate court's authority. Pursuant to RSA 458:26 (1992), the superior court may decree a legal separation, on petition of either party, "which separation shall have in all respects the effect of a divorce . . . ." We disagree that the mere removal of Lanoue created a *de facto* legal separation, and the appellant cites no authority, nor can we find any, to support this argument.

*Affirmed.*

BROCK, C.J., and NADEAU and DALIANIS, JJ., concurred.